UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 5885 |
| REAL PROPERTY AT 7401-7403 | ) | |
| SOUTH RACINE AVENUE, | ) | Judge John W. Darrah |
| CHICAGO, ILLINOIS, and REAL | ) | |
| PROPERTY AT 8046 SOUTH | ) | |
| KIRKLAND AVENUE, CHICAGO, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The United States of America brought this action for foreclosure against two pieces of real property owned by the Claimant, Mahmoud Abufarha. One property is a grocery store located at 7401-7403 South Racine Avenue, Chicago, Illinois (the "Racine property"). The other is a residence located at 8046 South Kirkland Avenue, Chicago, Illinois (the "Kirkland property"). The United States alleges both properties should be forfeited because of Claimant's engaging in wire fraud and food stamp fraud.

A bench trial was held on March 1 and March 3, 2010. The trial included the testimony of several witnesses and the admission of various exhibits into evidence. Closing arguments were presented by the United States and Claimant. The parties have

also submitted stipulated facts, proposed findings of fact and conclusions of law, and post-trial briefs in response to specific written questions from the Court.[1]

The Court has considered the evidence, including the testimony of the witnesses and exhibits, and has further considered the written submissions of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity of the witness to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. § 1.13 (2009).

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all of the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent,

---

[1] The Government and Claimant were ordered to address the following questions: (1) What is the law regarding tracing proceeds of a crime when those proceeds are commingled with other assets? (2) How should the evidence be interpreted to determine what amount of fraudulent proceeds existed in Claimant's bank accounts as of August 28, 2002? (3) If a certain amount of proceeds can be traced from unlawful activity to Claimant's properties but there is no evidence regarding the total value of those properties at any point in time, can the Government seize the entire property? If so, how should that be accomplished?

if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The Decision section of this Opinion and Order, for purposes of organization and clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, it shall be so deemed.

## FINDINGS OF FACT

### *The USDA Food Stamp Program*

The Food Stamp Program is a congressionally authorized program overseen by the United States Department of Agriculture's ("USDA") Food and Nutrition Service ("FNS"). It provides assistance to qualifying individuals in Illinois through an Electronic Benefit Transfer ("EBT") system known as the "LINK Program."

During the period of time relevant to this case, a food stamp purchase transaction in Illinois would occur as follows: The food stamp recipient's LINK card is either swiped through the Point of Sale ("POS") terminal, or the number on the card is manually entered into the POS terminal at the retailer location. The store clerk then enters the dollar amount of the transaction into the POS device, and the food stamp recipient enters his or her Personal Identification Number in the POS keypad. The POS terminal then dials a telephone number that is connected to the LINK administrator's host computer in another state. The transaction is compared to, among other things, the recipient's account balance; if there are sufficient funds in the account, the transaction is authorized by the host computer. The authorization is communicated back to the POS terminal in Illinois, which prints a receipt for the transaction. Funds are electronically transferred into the

retailer's designated bank account daily. The LINK administrator collects records of each LINK transaction and regularly forwards that information to the USDA.

To become eligible to participate in the Food Stamp Program, store owners in the Chicago area are required to complete, sign, and submit to the Chicago Field Office of the USDA a Food Stamp Program Application for Stores ("FNS application"). The application process also involves an interview and an on-site visit. Upon completion of the application process, if the store and its owner qualify, the store is authorized to redeem food stamp benefits and receives a POS terminal (i.e., a LINK machine). Approved stores are issued a unique non-transferable food stamp authorization number that allows the store to accept food stamp benefits as payment for eligible food items.

<em>Claimant's Food Stamp Fraud</em>

Claimant first applied for and received authorization to participate in the Food Stamp Program in April 2000 for a store called 74 Foods located at 1205 West 74th Street, Chicago, Illinois. Although Claimant's wife was identified as the store's owner on the FNS application, she never exercised any actual control, authority, or management over the store. When Claimant and his wife applied for authorization for 74 Foods, they reported estimated annual eligible food sales of $180,000.

Claimant left 74 Foods in early 2001.[2] In June 2001, Claimant, through his wife, submitted another FNS application for a new store at the Racine property. Claimant was identified as the store manager. The new store was called 74 Discount. The FNS application for 74 Discount listed estimated annual eligible food sales in the amount of

---

[2] Claimant testified that he was evicted from the store in early 2001 when his landlord failed to pay taxes and lost the building.

4

$270,000. At the time Claimant submitted his FNS application for 74 Discount, his wife was currently under investigation for food stamp fraud that occurred at 74 Foods before it closed. On August 13, 2002, in a letter addressed to "Ms. Abufarha and all Corporate Officials," the USDA notified Claimant's wife that she, as owner of 74 Foods, was permanently disqualified from the Food Stamp Program for selling ineligible items and accepting food stamp benefits in exchange for cash.

During the application process for 74 Discount, Claimant signed a Retailer Training Acknowledgement, agreeing, among other things, that he understood that exchanging cash for food stamp benefits was illegal. Claimant also signed an EBT Retailer Agreement, agreeing that only eligible food items would be exchanged for food stamp benefits and accepting responsibility on behalf of 74 Discount to prevent Food Stamp Program violations.

On August 20, 2001, FNS officials made a pre-authorization visit to 74 Discount to determine if the store was eligible to participate in the Food Stamp Program. FNS officials recorded the following observations: (1) the store was a medium/small grocery store in a residential area with the nearest store on the opposite corner; (2) the store had street parking only; (3) the store had one cash register/checkout stand with no optical scanners; and (4) the store had no shopping carts or baskets available.

On August 29, 2001, Claimant changed 74 Discount's FNS application to indicate that projected annual eligible food sales were $130,000, rather than $270,000. On September 18, 2001, 74 Discount received authorization to accept LINK cards. 74 Discount began redeeming food stamp benefits in late October 2001.

In July 2002, the USDA Office of the Inspector General ("OIG") noticed that 74 Discount's monthly redemptions appeared to be increasing beyond what would be expected for a store with its characteristics. Mireille Swain, Senior Special Agent for the Chicago office of the OIG, then analyzed 74 Discount's EBT redemption data. During November 2001, the first full month that 74 Discount accepted LINK cards, 74 Discount redeemed $5,410 in benefits.[3] That number rose to $15,469 the following month and climbed above $50,000 in April 2002. In September 2002, 74 Discount redeemed $141,236 in LINK benefits. During the two days during which 74 Discount was eligible to accept LINK cards in October 2002, 74 Discount redeemed $26,680 in benefits. On October 2, 2002, 74 Discount's LINK machine was seized. From October 2001 through October 2, 2002, 74 Discount redeemed a total of $522,675 in benefits. Based on her experience investigating cases of food stamp fraud over the course of 18 years with the OIG, and the information obtained during the investigation of 74 Discount, Agent Swain determined that food stamp benefit trafficking occurred at 74 Discount from December 2001 through October 2, 2002.

74 Discount's EBT transactions demonstrate a pattern of repeated large transactions in excess of $100 occurring in very short time periods. For example, on April 1, 2002, at 10:31 a.m., a LINK card was used to make a $206.46 purchase at 74 Discount. Less than forty-five minutes later, the same card was used to make another $106.71 purchase at 74 Discount. The following month, two separate $150.22 transactions and an additional $100.01 were charged at 74 Discount to the same card on

---

[3] Unless otherwise noted, all monetary figures in this Opinion are rounded to the nearest whole dollar.

the same day. As another example, on January 26, 2002, 74 Discount charged a single LINK card with $665.98 in two visits within an hour-and-a-half. The Government has moved into evidence pages of transactions exceeding $100, which show many more examples of high-dollar transactions occurring within short periods of time on the same LINK card.

The Government also presented the testimony of a witness who used her LINK card to obtain cash at 74 Discount on several occasions, including twice in April 2002.

During the course of her investigation, Agent Swain looked at redemption data for two similarly situated stores in the same geographic area as 74 Discount. She personally visited both stores, reviewed the FNS applications submitted by those stores, and reviewed the EBT transaction data for both stores. Both stores were located within a few blocks of 74 Discount. Both stores were of a similar size to 74 Discount and had similar layouts. Like 74 Discount, neither store had any optical scanners, shopping carts, or shopping baskets.[4] All three stores had one checkout stand and one register. From January 1, 2002, through October 2002, 74 Discount had EBT transactions of $501,768 compared to $49,859 and $88,458 at the other two stores.

On October 1, 2002, the OIG conducted five undercover transactions. The following day, law enforcement officials executed a search warrant at 74 Discount.

---

[4] Claimant testified that he acquired shopping carts and baskets after receiving authorization to participate in the Food Stamp Program and also submitted the testimony of Nancy Meeks-Cox from Claimant's criminal trial. Ms. Meeks-Cox testified that she occasionally worked at 74 Discount and that Claimant had six to eight baskets and four carts. But the evidence reveals that there were no baskets or carts at 74 Discount on October 2, 2002, when Claimant was arrested. Ms. Meeks-Cox's statements were not subject to cross-examination in the instant case; to the extent her testimony is contradicted by other evidence in this case, it is entitled to little weight.

Among other things, they recovered two hand-written conversion charts taped to the cash register, which Claimant created as an aid to calculate the amount of cash to be exchanged for given amounts of benefits. Claimant was arrested for food stamp trafficking and later indicted in case number 02 CR 957 (N.D. Ill.) on numerous counts of wire fraud and food stamp fraud. Although he initially denied any wrongdoing, Claimant later pleaded guilty to four counts of food stamp fraud and nine counts of wire fraud; he was sentenced to a term of probation.

In the instant case, Claimant testified as an adverse witness in the Government's case in chief and on his own behalf. He admitted lying to agents about his food stamp trafficking and later pleading guilty to counts of wire fraud and food stamp fraud. Claimant maintains that he only exchanged food stamps for cash on three or four occasions, all in September 2002. He stated that he did not commit any food stamp fraud before September 2002 and that he is not aware of any such fraud taking place at 74 Discount at any other time.

Claimant attributed his increased sales at 74 Discount to good service and quality meat. In an effort to explain 74 Discount's large transactions, Claimant testified that 74 Discount sold packages of fresh meat for as much as $150 and that some large transactions were for repayment of credit he had extended to customers who had run out of money on their LINK cards. Claimant had no itemized receipts to show bulk meat sales and no records to support any extensions of credit. Claimant also sought to explain the existence of multiple uses of a single card within short periods of time by testifying that sometimes multiple persons in the same family would use the same card but make

separate purchases. Although he admitted that the store had only $15,000 in inventory on October 2, 2002, when he was arrested, Claimant testified that 74 Discount had approximately $80,000 in inventory in January 2002.

Claimant's testimony is not credible. It defies common sense to believe that a medium/small grocer was engaging in the kind of large-scale, back-to-back transactions suggested by Claimant. It defies common sense to believe that this medium/small grocer more than doubled its anticipated eligible food sales in its first year of operation, outperformed two comparable stores five times over, and racked up $141,236 in EBT redemptions in September 2002 alone with only three or four fraudulent transactions. It also defies common sense to believe that Claimant was extending hundreds of dollars of credit to individual customers without any supporting documentation.

Moreover, Claimant admits to having lied to federal agents; and he is a convicted felon, who was convicted of crimes involving dishonesty. Such convictions may properly be considered in evaluating the credibility of a witness. Fed. R. Evid. 609(a)(2). Taken together, these facts greatly diminish Claimant's testimony, especially where, as here, his testimony is contradicted by other evidence in the case.

### Following the Money

The Government presented testimony of Daniel Berwick, a Special Agent with the Internal Revenue Service's criminal-investigation unit. Agent Berwick investigated 74 Discount for suspected money laundering after the USDA identified the store as participating in food stamp fraud. Agent Berwick analyzed 74 Discount's EBT records and bank records and determined that Claimant was engaged in money laundering, as

well as food stamp fraud. Agent Berwick also personally participated in the execution of the search warrant on October 2, 2002.

According to the records analyzed by Agent Berwick, Claimant had control over four bank accounts: a checking account for 74 Discount at Bridgeview Bank (where EBT redemptions were deposited), a personal checking account at Bridgeview Bank, a personal savings account at Bridgeview Bank, and a personal checking account at United Trust.

Agent Berwick also analyzed records regarding the loans on the defendant properties. On May 20, 1996, Claimant took out a loan in the amount of $112,100, which was secured by a mortgage on the Kirkland property. There is no evidence as to what, if any, down payment was made. On April 22, 2002, Claimant refinanced his mortgage loan on the Kirkland property with Countrywide Home Loans. A balance of $106,395 was paid off on the original loan, and a new loan was granted in the amount of $106,000, secured by a mortgage on the Kirkland Property. Claimant and his wife are the beneficial owners of the Kirkland Property as joint tenants with right of survivorship.

On May 18, 2002, $63,000 from the 74 Discount checking account and $8,500 from the Bridgeview personal checking account were transferred into Claimant's Bridgeview savings account. On May 21, 2002, $11,000 was withdrawn from Claimant's personal savings account for an unknown purpose. On August 28, 2002, another $45,556 was moved from the 74 Discount checking account to Claimant's personal savings account. That same day, $106,556 was wired from the Claimant's personal savings account to Countrywide Home Loans, paying off the mortgage loan on the Kirkland

property in full. Claimant testified that some of the money used to pay his mortgage loans on the Kirkland and Racine properties came from overseas. No supporting documentation was produced. Claimant also stated that he does not know what percentage of the payments on his mortgage loans came from food stamp redemptions.

From January 2002 through September 2002, a total of $474,769 in EBT redemptions was deposited into the designated checking account for 74 Discount at Bridgeview Bank. During that same period, only $11,975 in non-EBT funds were deposited into that account. Thus, approximately 98 percent of the deposits into the 74 Discount checking account were from EBT redemptions. During that time, Claimant had no other documented source of income beyond what he received through 74 Discount.

The Racine property was also mortgaged. On March 1, 2001, Claimant obtained a $36,000 loan secured by the building in which 74 Discount was located. Claimant made regular automated payments on the loan from the United Trust account, which was funded by monthly deposits of $1,000 from Claimant's personal checking account, as well as by two large deposits ($26,000 and $24,000) from Claimant's 74 Discount account in December 2001 and September 2002.

At the close of his case in chief, Claimant presented the testimony of William Thullen, who was deemed qualified as an expert in the field of accounting and permitted to render an opinion in that field. Mr. Thullen analyzed records of purchases provided to him by Claimant, 74 Discount's sales tax records, and Claimant's own statements to formulate an opinion as to the amount by which Claimant overstated his

food stamp redemptions. Mr. Thullen prepared a schedule summarizing his opinions, which was admitted into evidence.

Because many of Claimant's records were not itemized, Mr. Thullen accepted Claimant's unsupported testimony that 80 percent of all non-itemized credit-card purchases were for eligible food items. Mr. Thullen also accepted Claimant's unsupported representation that all products were sold with a 35 percent markup. Based on these assumptions, Mr. Thullen opined that Claimant sold $445,240 in eligible food items between November 2001 and October 2, 2002. The actual amount of sales reported by 74 Discount during that time period (as taken from 74 Discount's EBT redemptions and state sales tax forms) was $587,570. Thus, 74 Discount's reported sales exceeded those computed based on 74 Discount's purchase receipts by $142,330. Mr. Thullen then determined that the ratio of reported sales to actual EBT redemptions was 89 percent and concluded that 74 Discount had overstated its food stamp sales by $126,476 (89 percent of $142,330).[5]

Some of Mr. Thullen's calculations are broken down by year; none are broken down by month. Mr. Thullen's ultimate opinion regarding the overstated food stamp redemptions is not broken down by year.

During cross-examination, the Government challenged some of the specific data used by Mr. Thullen in forming his opinion. In particular, the Government noted that Mr. Thullen relied on $14,417 in duplicate credit card statements. When the duplicate statements are removed from Mr. Thullen's computations, the amount of total sales

---

[5] Mr. Thullen's arithmetic appears to be incorrect. 89 percent of $142,330 is $126,674.

12

decreases to $429,669 (accepting Mr. Thullen's assumption that 80 percent of those non-itemized purchases were for eligible food items), and the overstatement of food stamp sales would increase from $126,476 to $140,532.

The Government also challenged the basis for Mr. Thullen's assumption that 80 percent of all purchases were for eligible food items and that all food was sold at a 35 percent markup. All of Claimant's non-itemized credit-card transactions were for purchases at Dearborn Wholesale. Without any supporting documentation, Claimant stated that 80 percent of those purchases were for eligible food items. Mr. Thullen relied on this figure in reaching his conclusion regarding Claimant's overstatement of food stamp sales. However, Claimant did produce some itemized cash receipts from Dearborn Wholesale, which reveal that less than 8 percent of Claimant's purchases at Dearborn Wholesale were for eligible food items. Therefore, the Government argues that Mr. Thullen should have calculated the overstatement based on an assumption that only 10 percent of Claimant's non-itemized purchases were for eligible food items.

The Government then submitted an exhibit showing how Mr. Thullen's calculations would be affected if only 10 percent of Claimant's non-itemized credit-card purchases were for eligible food items. If Mr. Thullen's figures were calculated based on that assumption (accounting for the duplicate credit card entries discussed above), the overstated amount of food stamp redemptions would be $260,913.

## CONCLUSIONS OF LAW

"Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *United States v. One 1989 Jaguar XJ6*, No. 92 C 1491,

1993 WL 157630, at *3 (N.D. Ill. May 13, 1993) (quoting *United States v. One Ford Coach*, 307 U.S. 219, 225 (1939)). Civil forfeiture actions are now subject to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), which raised the government's evidentiary burden in civil forfeitures. *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 454 (7th Cir. 2005) (citing 18 U.S.C. § 983(c)). The Government must establish by a preponderance of the evidence that the properties are subject to forfeiture. 18 U.S.C. § 983(c)(1). If the Government's theory of forfeiture is that the property was used to commit or facilitate, or was involved in the commission of, a criminal offense, the Government must establish a substantial connection between the property and the offense. 18 U.S.C. § 983(c)(3).

Any real property that was involved in a transaction in violation of 18 U.S.C. § 1957 (which makes it unlawful to knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000 if that property is derived from a statutory list of "specified unlawful activity") is also subject to forfeiture. 18 U.S.C. § 981(a)(1)(A). Food stamp fraud and wire fraud both constitute "specified unlawful activity" within the meaning of the statute. *See* 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(D).

Additionally, any real property "which constitutes or is derived from proceeds traceable to a violation of" 18 U.S.C. § 1343 (wire fraud) or 7 U.S.C. § 2024(f)(2) (food stamp fraud) is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(1)(C).

"In cases involving . . . unlawful activities, . . . the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the

offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). Thus, all benefits received as a result of food stamp fraud are forfeitable, not just the ill-gotten profits above the cash amounts paid to the food stamp beneficiaries. *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) ("Whether or not [Defendant] shared the cash he received from the government with the food stamp beneficiary, the entire loss amount paid by the government was diverted from its intended purpose.").[6]

When proceeds of unlawful activities are commingled with legitimate funds, tracing becomes a difficult task. However, the Seventh Circuit has found it unnecessary to specifically trace fraudulent proceeds through a bank account when those criminal proceeds vastly exceed the sums on deposit at the time of the seizure. *United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir. 1992); *see also United States v. Ali*, No. 02 CR 825, 2006 WL 2038597, at *3 (N.D. Ill. July 17, 2006) (holding that real property and money seized from bank accounts were traceable to food stamp fraud because the total value of those assets was less than the total amount of proceeds obtained by fraud).

The Government is only entitled to the portion of the property that was purchased with proceeds of unlawful activity. *See, e.g., United States v. One 1980 Rolls Royce*, 905 F.2d 89 (5th Cir. 1990) (holding that claimant could avoid forfeiture to the extent that a portion of the property was purchased with legitimate funds). "[T]he presence of

---

[6] In his post-trial brief, Claimant argues that "proceeds" should be interpreted as "net proceeds." However, Claimant's argument relies exclusively on cases interpreting statutes for which "proceeds" is not a defined term. As discussed above, the term is specifically defined in 18 U.S.C. § 981(a)(2).

one illegal dollar in an account does not taint the rest – as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d at 476-77.

## DECISION

The Government has established by a preponderance of the evidence that Claimant engaged in food stamp fraud and wire fraud by exchanging EBT benefits for cash at 74 Discount.

### 7401-7403 South Racine Avenue

The Government has also established by a preponderance of the evidence that Claimant's food stamp fraud and wire fraud constitute monetary transactions in criminally derived property of a value greater than $10,000, such that Claimant engaged in money laundering in violation of 18 U.S.C. § 1957. Furthermore, the Government established by a preponderance of the evidence that the Racine property bore a substantial connection to the fraudulent transactions in violation of § 1957 – it was at this location that Claimant accepted LINK benefits in exchange for cash, and it was at this location that Claimant wired the fraudulent EBT transactions to the LINK administrator out of state. Therefore, the Racine property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), regardless of the source of the funds used to purchase that property.

### 8046 South Kirkland Avenue

Although the Government argues that it has presented "alternate legal theories" of recovery on both of the defendant properties, the Government's Complaint specifically alleges that the Kirkland property is subject to forfeiture as traceable proceeds under

18 U.S.C. § 981(a)(1)(C). The Government does not allege that the Kirkland property is subject to forfeiture as being involved in a money-laundering transaction. (*See* Compl. ¶ 12.) Accordingly, the Kirkland property is only subject to forfeiture to the extent the Government can prove that it was purchased with funds that can be traced to the proceeds of Claimant's food stamp and wire fraud.

The Government has established by a preponderance of the evidence that Claimant overstated his food stamp sales from November 2001 to October 2, 2002, and that some of Claimant's fraudulent activities occurred prior to August 28, 2002 – the date on which the mortgage on the Kirkland property was paid off. The date is critical; any fraudulent proceeds obtained after August 28, 2002, cannot be traced to the Kirkland property, which was owned free and clear as of that date by Claimant.

Significantly, the evidence shows that Claimant's fraudulent activities greatly increased after August 28, 2002; and all counts on which Claimant was convicted were based on conduct that occurred in September and October 2002. Although the Government has established that *some* food stamp fraud occurred before the mortgage loan was paid off, the Government has offered only circumstantial evidence as to the specific amount of fraudulent proceeds acquired before August 28, 2002.

In its post-trial brief, the Government suggests a new method by which the Court should determine the amount of Claimant's fraudulent proceeds acquired before August 28, 2002.[7] The Government argues that *all* food stamp transactions over $50

---

[7] At trial, the Government did not persuasively demonstrate what amount of proceeds were unlawfully obtained *before* August 28, 2002. It was only in response to

must be fraudulent and that the Kirkland property must be forfeited to the extent it can be traced to Claimant's EBT redemptions in excess of $50. According to the Government, this theory is supported by Agent Swain's testimony that the prevalence of transactions in excess of $50 was indicative of possible food stamp trafficking. But Agent Swain did not testify that all transactions over $50 are decidedly fraudulent; she testified that "multiple transactions with multiple different cardholders of more than $50 in a short amount of time [are] not usually likely in a small store" such as 74 Discount (Tr. 30) and, "You would normally see in a store of 74 Discount's size transactions $20, $30 at the most, $50 being generous because sometimes people do buy more." (Tr. 60). No evidence was presented regarding, for example, the average transaction amount at similar stores. Thus, the Government has not shown by a preponderance of the evidence that all transactions over $50 (or any specific percentage of such transactions) were fraudulent.

However, the Government also presented a summary of all LINK transactions in excess of $100, which was admitted into evidence without objection. Considering Agent Swain's testimony, evidence regarding the characteristics of 74 Discount, and evidence regarding the suspicious circumstances surrounding numerous $100-plus transactions, the Government has shown by a preponderance of the evidence that the vast majority of all LINK transactions over $100 were indeed fraudulent.[8] From January 2002

the Court's request for post-trial briefing that the Government set forth its theory regarding the computation of proceeds before August 28, 2002.

[8] It is of course *possible* that some customers legitimately purchased over $100 worth of eligible food items with their LINK cards. But it is also likely that numerous transactions of less than $100 were fraudulent, and the Government is not required to trace the proceeds to particular fraudulent transactions. *United States v. 1948 Martin Luther King Drive*, 270 F.3d 1102 (7th Cir. 2001). On balance, the

through August 2002, the total amount of LINK transactions in excess of $100 was $174,317.[9]

From January 2002 through April 2002, $142,793 in EBT redemptions was deposited into Claimant's designated account. Of that amount, $78,838 was from transactions in excess of $100. On May 18, 2002, Claimant transferred $63,000 into his personal savings account. Because that was less than the amount of fraudulent proceeds, the money transferred into the personal savings account is traceable to Claimant's fraudulent activities. Also on that date, Claimant transferred $8,500 from his personal checking account to his personal savings account. On May 21, 2002, Claimant withdrew $11,000 from his personal savings account, leaving a total of $60,500 – a sum that was less than the traceable proceeds of Claimant's fraudulent activities.

Similarly, from May 2002 through August 2002, $191,184 in EBT redemptions was deposited into Claimant's designated account. Of that amount, $95,479 came from transactions in excess of $100. On August 28, 2002, Claimant then transferred $45,556 into his personal savings account. Because that was considerably less than the amount of

---

presumption that only those transactions over $100 were fraudulent benefits the Claimant, not the Government. Indeed, Claimant's total redemptions for transactions less than $100 between January 2002 and October 2002 were $228,839 – a figure that is considerably higher than the redemptions at the comparison stores.

[9] This number is not inconsistent with the Government's position that Mr. Thullen's calculations would establish a $260,913 overstatement for the entire period between November 2001 and October 2002 if computed with the reasonable assumption that only 10 percent of Claimant's Dearborn Wholesale purchases were for eligible food items. Additionally, the Court may treat the estimated sales on Claimant's signed FNS Application as an adequate calculation of legitimate food sales. *See United States v. Alburay*, 415 F.3d 782, 789-90 (7th Cir. 2005) (computing restitution award). Claimant's total EBT redemptions exceeded that figure by $202,792.

fraudulent proceeds, the money transferred into the personal savings account is traceable to Claimant's crimes. Thus (without accounting for interest, for which the Government made no calculation), Claimant had $106,056 in his personal savings account – a sum that was less than the traceable proceeds of Claimant's fraudulent activities. That same day, Claimant paid $106,556 from his personal checking account to Countrywide Home Loans, paying off the mortgage loan on the Kirkland Residence.

The Government thus falls $500 short of proving that the entire balance of the mortgage loan on the Kirkland property was paid with proceeds of Claimant's unlawful activities. But an extra $500 would not entitle the Government to the entire property because the Government has not established that the $106,556 mortgage payment represented the total purchase price of the Kirkland property. In fact, the parties stipulated that in 1996, the Kirkland property was used to secure a mortgage loan in the amount of $112,100. Furthermore, there was no evidence as to what, if any, down payment was made at closing, and neither party offered any evidence as to the value of the Kirkland property when it was purchased, when it was refinanced, or at the time of trial. Nor is there any evidence regarding what, if any, payments were made on the mortgage loan prior to October 2001, when Claimant began accepting LINK cards at 74 Discount.

The Government nonetheless argues that it can seize the entire Kirkland property regardless of the property's value, so long as it has proven that the property was purchased with the proceeds of unlawful activity. This statement oversimplifies the law.

20

As discussed above, the Government is only entitled to the portion of the property that was purchased with proceeds of unlawful activity.

The cases cited by the Government in support of its argument that the entire property is subject to forfeiture are inapposite. In *United States v. 1948 Martin Luther King Drive*, 270 F.3d 1102, 1114 (7th Cir. 2001), the claimant argued that the government could not take the entirety of his property unless the government proved what portion of the down payments and loan payments were made with unlawful proceeds. The Seventh Circuit rejected the argument, finding that the government was entitled to the entire property unless the claimant could prove that a portion of it was legitimately purchased. *Id.* But that case relied on pre-CAFRA law. Before CAFRA, the government only had to demonstrate probable cause for forfeiture, at which point the burden shifted to the claimant to prove by a preponderance of the evidence that the property was purchased with legitimate funds. Post-CAFRA, the government must establish by a preponderance of the evidence that the property is forfeitable.[10]

In another case cited by the Government, *United States v. Loe*, 49 F. Supp. 2d 514 (E.D. Tex. 1999), the district court specifically held that only a portion of the defendant property could be forfeited to the government. One of the claimants purchased the defendant property for $965,000. *Id.* at 520. The purchase was comprised of $507,491 in

___

[10] As mentioned above, after the conclusion of the bench trial, the parties were directed to file briefs addressing specific legal issues in this case. In addressing those issues, the parties were specifically ordered to address how any pre-CAFRA authority should be applied in the instant case. The Government conclusively asserts that its pre-CAFRA cases do not involve any of the procedural changes effected by CAFRA. This assertion is incorrect, and the Government's repeated assertions that it is Claimant's responsibility to demonstrate that some portion of his property was purchased with legitimate funds ignores the burden shift put in place by CAFRA.

tainted funds and $457,509 in untainted funds. *Id.* The home was later appraised at $1.5 million. *Id.* The district court determined that only 52.6 percent of the property – the portion purchased with tainted funds – was subject to forfeiture. *Id.* at 521. The court thus held that the United States was entitled to an undivided 52.6 percent interest in the defendant property and that the government and the claimant should share any appreciation of the property in relation to their ownership interests. *Id.* at 524. In another case cited by the Government, the district court entered a similar order, holding that the forfeiture sale proceeds should be divided such that the Government would receive 61 percent and the claimant would receive 39 percent after subtracting the costs of sale. *United States v. One Parcel of Real Property Known as 352 Northrup St.*, 40 F. Supp. 2d 74, 82 (D.R.I. 1999). The claimant's 39 percent interest was attributable to $15,000 in legitimate funds, which were used to improve the property after purchase. *Id.*

Other cases cited by the Government simply hold that the Government is entitled to any appreciation of the value of the property purchased with proceeds. *See United States v. Hill*, No. 01-6322, 2002 WL 31119692, at *2 (6th Cir. 2002); *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998). As discussed above, the Government is only entitled to the appreciation for that share of the property that is subject to forfeiture.

In this case, the Government has not provided the Court with evidence necessary to determine what specific share of the property is forfeitable to the Government. Accordingly, the Court finds that the Government's interest in the Kirkland property is

limited to $106,056 – the specific amount proven to be traceable proceeds of Claimant's unlawful activities.

## CONCLUSION

Based on the foregoing, it is hereby ordered, adjudged, and decreed, pursuant to 18 U.S.C. §§ 981 and 983:

A.    That a judgment of forfeiture is entered in favor of the United States and against the defendant real property commonly known as 7401-7403 South Racine Avenue, Chicago, Illinois; and

B.    That a judgment of forfeiture in the amount of $106,056 is entered in favor of the United States and against the defendant real property commonly known as 8046 South Kirkland Avenue, Chicago, Illinois.

Date: _March 30, 2010_

JOHN W. DARRAH
United States District Court Judge